IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA
ERIE DIVISION

| | |
|---|---|
| PETER IN, | ) |
| Plaintiff | ) Case No. 1:19-cv-000224 |
| vs. | ) |
| | ) HON. RICHARD A. LANZILLO |
| DANIEL STROUP, | ) UNITED STATES MAGISTRATE JUDGE |
| Defendant | ) MEMORANDUM OPINON ON |
| | ) DEFENDANT'S MOTION FOR |
| | ) SUMMARY JUDGMENT |
| | ) ECF NO. 77 |

## I. Background and Procedural Posture

Plaintiff Peter In ("In") is an inmate in the custody of the Pennsylvania Department of Corrections at its State Correctional Institution at Albion ("SCI-Albion"). Acting *pro se*, In commenced this action against Defendant Daniel Stroup ("Stroup"), a physician assistant and member of SCI-Albion's medical staff.[1] (ECF No. 8) (Complaint). In claims that Stroup was deliberately indifferent to his serious medical needs in violation of the Eighth Amendment's prohibition against cruel and unusual punishment. He seeks redress of this violation pursuant to 42 U.SC. 1983.[2]

---

[1] This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343. The parties have consented to the jurisdiction of a United States Magistrate Judge to conduct all proceedings in this case as authorized by 28 U.S.C. § 636.

[2] More than four years before the commencement of this action, on August 26, 2015, In filed an action raising similar claims against Stroup and other defendants. *See In v. Wetzel*, no. 1:15-CV-00160-SPB. The Court dismissed all claims in that action with prejudice on March 17, 2017, based on In's failure to exhaust his administrative remedies. *See id.* at ECF Nos. 82, 83. In's claims in this case are limited to those that arose after the conduct and events that were the subject of his prior action.

1

On Stroup's earlier motion pursuant to Fed. R. Civ. P. 12(b)(6), the Court dismissed all claims against him with prejudice except a single Eighth Amendment deliberate indifference claim based on medical treatment In received after March 17, 2017. *See* ECF No. 56, pp. 4-6. Stroup's pending motion for summary judgment now challenges that remaining claim on both procedural and substantive grounds. The motion has been fully briefed and is ripe for decision. *See* ECF Nos. 78, 98, 101, 104, 105. For the reasons that follow, the Court will grant the motion.

## II. Material Facts

The following facts are taken from the parties' Concise Statements of Material Facts and exhibits thereto. *See* ECF Nos. 78-1, 78-2, 78-3, 78-4, 79, and 99. Disputed facts are noted. In has been incarcerated at SCI-Albion since March 2013. During his incarceration, he has been treated in the medical department at SCI-Albion on approximately 25-30 occasions. *See* ECF No. 78-1, p. 4. He has been seen by Stoup on about 13 or 14 of those occasions. *See id.* At issue in this case is a genital skin irritation that In has experienced to varying degrees since 2014. *See* ECF No. 8, ¶ 15. His condition has been diagnosed as Fordyce Spots or folliculitis, both of which refer to a benign skin condition in which hair follicles become inflamed. Fordyce Spots are specific to the genitals, while folliculitis is a more general term. *See* ECF No. 78-3, p. 6. In has described his condition as excessive small bumps on his scrotum and genital area that cause "inflammation" and "unbearable itchiness." *See* ECF No. 8, ¶ 14. In saw Stroup specifically for this condition on seven or eight occasions. *See* ECF No. 78-1, p. 4. He also saw five or six other members of the SCI-Albion medical staff for this condition. *See id.*

In was seen by Erin Hayton, a Certified Registered Nurse Practitioner (CRNP), on October 18, 2018. CRNP Hayton's progress notes from that visit record the following:

> **Subjective**: [I]nmate seen in sick call for previous diagnosis of Fordyce spots on scrotum and concern [sic] that he needs treatment. He has bumps that come and go, sometimes getting inflamed and then clearing on own. Inmate seen with male nurse Vogan... **Objective Comments**: scrotum skin appears normal with normal hair pattern. The bumps that inmate is referring to are hair follicles. No s/s infection or inflammation at this time... **Assessment**: normal skin. **Information**: Inmate has no infection at this time... Folliculitis explained as likely cause of what he was describing. He does not need any treatment or to be seen by a specialist as his request states.

ECF No. 78-2, p. 40.

In was scheduled for a follow-up appointment for the Fordyce spots on November 2, 2018, but his medical records state that he did not show up for the appointment. *See id.* at 39. On November 21, 2018, In returned to medical for another evaluation of his Fordyce spots and was seen by Stroup. Stroup recorded the following regarding the visit:

> **Subjective**: sick call c/o spots on scrotum, previously Dx as Fordyce spots by multiple providers/Doctors, wants outside consult with dermatology... **Objective Comments**: Fordyce spots unchanged from previous exams, NP Gasser also evaluated no erythema or indications of folliculitis. Dr Hartwell declined exam... **Assessment**: L98.9 – Skin disease, other, unspec. – [FURLAN, JOSEPH]... **Information**: derm telemed submitted by Dr. Hartwell.

*Id.* at 37.

In paraphrased the discussion during this follow-up appointment with Stroup as follows:

> **Stroup**: You know why you're here I presume.
> **In**: Not really.
> **Stroup**: You made a request to be seen by a specialist or referred to one. Well, I'm sorry to tell you that we're not going to refer you to any specialist. There's nothing for you to be seen by an outside specialist for. It would be wasting money that the department doesn't have to waste so your request is denied...

ECF No. 8, ¶¶ 65-68.

In states that when he was exiting Stroup's office he stopped to talk to another doctor (Dr. Wolfson) to explain his medical problem and how he felt he was receiving inadequate care. *See id.*, ¶¶ 72-74. Dr. Wolfson said they would schedule In to see a dermatologist. *See id.* On December 18, 2018, In again was a no-show for a sick call (author Brian Max Wolfson, MD).

3

*See* ECF No. 78-2, p. 36. On January 9, 2019, In was seen in medical for a telemedicine appointment with a dermatologist (author Erin Hayton, CRNP):

> **Subjective**: inmate seen with dermatology telemedicine regarding hyper-pigmented papules on scrotum. . . **Objective Comments**: see picture in emr. . . **Assessment**: per derm: angiokeratoma suspected; r/o benign keratosis or junctional nevus. . . **Information**: Dermatology recommending shave biopsy for definitive diagnosis given patients [sic] concern. . . **Follow up to**: please schedule f/u with PA stroup [sic] for shave biopsy.

*Id.* at 34-35.

The January 14, 2019 Medical Progress (author Stroup) note reads:

> **Subjective**: f/u derm telemed. . . **Objective Comments**: recommends shave biopsy of angioderatoma of Fordyce spots. . . **Assessment**: angiokeratoma of Fordyce spots. . . **Information**: no practitioner at this institution willing to incur risks of doing this procedure "for definitive diagnosis given patient's concern", will contact regional medical director for guidance on further consultations. . . discuss w/ Dr. Wolfson to see if he wishes to do shave Rx. . . **Follow-up to**: w/ Dr. Wolfson to see if he wishes to do shave Rx.

*Id.* at 32-33.

The final medical note in the record was written by Brian Max Wolfson, MD regarding In's visit on January 29, 2019. This note states, "**Subjective**: met with patient to discuss possible shave biopsy of questionable lesions on scrotum. Scrotum examined and benign keratosis and nevus visualized. Patient concerned that photograph taken was not the effected [sic] area. [W]ill arrange telemed consult with portable camera to transmit images of affected area." *Id.* at 29.

In asserts that Stroup later told him:

> I'm sorry to have to inform you this, but I believe a biopsy is just not going to happen . . . There's no one here that qualifies to do the biopsy or they have chosen not to conduct the biopsy on whatever it is that you have. I qualify to do the biopsy, but personally will not do the biopsy on whatever it is that you have or believe you have. In my personal opinion, that's just too much work that would have to be done that is not actually required for what you have. More than likely you won't be getting sent to get the biopsy done elsewhere because quite frankly it could be a waste of our department's time and expenditures. Sorry, there's nothing I can do for you.

4

ECF No. 8, ¶ 83 (edited for clarity). In also asserts that Stroup further advised him: "Like I said there's no medication that I have to prescribe to you for that. There's nothing else that we can do for your condition that will help that we haven't tried." *Id.*, ¶ 85 (edited for clarity).

On October 22, 2018, before several of the treatment decisions and actions presently at issue in this lawsuit, In filed Grievance #767002 regarding his medical treatment. That grievance complained that the medical department was not providing adequate medical treatment for In's skin condition.[3] (*See* ECF No. 78-3 for history of Grievance 767002 to final appeal.) Grievance #767002 did not mention Stroup. The grievance asserted that In's condition had been misdiagnosed as Fordyce Spots and folliculitis and requested that he be seen by a specialist. *See id.* at 6.[4] The grievance was denied on November 9, 2018. The Grievance Officer characterized the claim as "frivolous secondary to receiving the appropriate, standard medical care and treatment specific to his complaints, clinical presentation and examination findings." *Id.* The Grievance Officer explained the benign nature of Fordyce Spots as follows:

> Fordyce spots are visible sebaceous glands that are present in most individuals. They appear on the genitals and/or the face and in the mouth. They appear as small, painless, raised, pale, red or white spots or bumps 1 to 3 mm in diameter that may appear on the scrotum, shaft of the penis or on the labia, as well as the inner surface (retromolar mucosa) and vermillion border of the lips of the face. They are not associated with any disease or illness, nor are they infectious but rather they represent a natural occurrence on the body. No treatment is therefore required, unless the individual has cosmetic concerns.

*Id.*

---

[3] The Court notes that the date of Grievance #767002, the only grievance of record, was filed after only one medical appointment at issue in this case (October 18, 2018), and prior to the telemedicine dermatology appointment.

[4] Because In's grievance is illegible, the summary is taken from the grievance denial.

In appealed the denial of the grievance to the Facility Manger on November 16, 2018. In's appeal specifically named Stroup as a person who delayed the diagnosis of his condition and allegedly misdiagnosed it as Fordyce Spots or folliculitis. *See id.* at 8. On December 12, 2018, the Facility Manger upheld the Grievance Officer's decision. *See id.* at 9. On December 17, 2021, In submitted a final appeal citing improper treatment by the medical staff and pleading to see a specialist. On January 23, 2019, In's final appeal was denied: "The Bureau of Health Care Services has reviewed the medical record and has determined the medical care provided was reasonable and appropriate. The findings of this review concur with the Initial Review Response dated 11/09/2018… No wrongdoing has been identified." *Id.* at 2.

### III.    Standard and Scope of Review

Federal Rule of Civil Procedure 56(a) requires the court to enter summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Under this standard "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A disputed fact is "material" if proof of its existence or nonexistence would affect the outcome of the case under applicable substantive law. *See Anderson*, 477 U.S. at 248; *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). An issue of material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson*, 477 U.S. at 257; *Brenner v. Local 514, United Bhd. of Carpenters and Joiners of Am.*, 927 F.2d 1283, 1287-88 (3d Cir. 1991).

When determining whether a genuine issue of material fact remains for trial, the court must view the record and all reasonable inferences to be drawn therefrom in favor of the nonmoving party. *See Moore v. Tartler*, 986 F.2d 682 (3d Cir. 1993); *Clement v. Consol. Rail Corp.*, 963 F.2d 599, 600 (3d Cir. 1992); *White v. Westinghouse Electric Co.*, 862 F.2d 56, 59 (3d Cir. 1988). To avoid summary judgment, however, the nonmoving party may not rest on the unsubstantiated allegations of his or her pleadings. Instead, once the movant satisfies its burden of identifying evidence that demonstrates the absence of a genuine issue of material fact, the nonmoving party must go beyond his pleadings with affidavits, depositions, answers to interrogatories or other record evidence to demonstrate specific material facts that give rise to a genuine issue. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

Further, under Rule 56, a defendant may seek summary judgment by pointing to the absence of a genuine fact issue on one or more essential claim elements. The Rule mandates summary judgment if the plaintiff then fails to make a sufficient showing on each of those elements. When Rule 56 shifts the burden of production to the nonmoving party, "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323. *See Harter v. G.A.F. Corp.*, 967 F.2d 846, 851 (3d Cir. 1992).

## IV. Discussion and Analysis

The sole remaining claim in this action centers on In's contention that Stroup violated his Eighth Amendment rights by failing to further investigate and treat his skin condition and refer him to an outside specialist for a shave biopsy. Stroup argues that he is entitled to summary judgment on this claim on both procedural and substantive grounds. First, he argues that In did not properly exhaust his administrative remedies as to the claim. Second, he asserts that the

7

record cannot support a finding that In had a "serious medical need" or that Stroup acted with deliberate indifference to In's medical needs.

### A. Stroup's Defense of Failure to Exhaust Administrative Remedies

Stroup argues that In did not exhaust his administrative remedies concerning his claim against him because he did not identify him in his grievance and complained only about the medical department's poor treatment and inconclusive diagnosis of his skin condition. "The Prison Litigation Reform Act of 1995 (PLRA) requires a prisoner to exhaust any available administrative remedies before challenging prison conditions in federal court." *Woodford v. Ngo*, 548 U.S. 81, 81 (2006). The exhaustion requirement allows "an agency 'an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into federal court,'" and promotes the efficient, prompt, and economical resolution of claims at the administrative level. *Id.* at 89. The failure of an inmate to exhaust available administrative remedies is an affirmative defense that the defendant must plead and prove. *See Jones v. Bock*, 549 U.S. 199, 216 (2007); *Rinaldi v. United States*, 904 F.3d 257, 268 (3d Cir. 2018) (citing *Ray v. Kertes*, 285 F.3d 287, 295 (3d Cir. 2002)).

Although the PLRA itself does not have a "name all defendants" requirement, *See Byrd v. Shannon*, 715 F.3d 117, 127 (3d Cir. 2013) (citing *Jones*, 549 U.S. at 217), it does require "proper exhaustion," meaning "complet[ing] the administrative review process in accordance with the applicable procedural rules." *Woodford*, 548 U.S. at 88. These procedural rules are supplied by the individual prisons. *See Jones*, 549 U.S. at 218 ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."); *see also Spruill v. Gillis*, 372 F.3d 218, 222 (3d Cir. 2004) (determining whether "a prisoner has 'properly' exhausted a claim ... is made by evaluating the prisoner's compliance with the prison's administrative

8

regulations governing inmate grievances"). In Pennsylvania's state prison system, grievance procedures and rules are set out in the DOC's Policy DC-ADM 804. Section 11(d) of that policy mandates that the inmate "shall identify individuals directly involved in the events." *See Green v. Maxa*, 2020 WL 1249205, at *5 (W.D. Pa. Mar. 16, 2020); *Jackson v. Carter*, 813 Fed. Appx. 820, 823 (3d Cir. 2020). Because the identification requirement is mandatory, "in the absence of any justifiable excuse, a Pennsylvania inmate's failure to properly identify a defendant constitute[s] a failure to properly exhaust his administrative remedies under the PLRA." *Williams v. Pa. Dep't of Corr.*, 146 Fed. Appx. 554, 557 (3d Cir. 2005) (failure to identify defendants in grievances "means that [plaintiff] failed to exhaust his administrative remedies in accordance with Pennsylvania's grievance process and the PLRA").

Nevertheless, courts have found that inmates may adequately identify individuals in a grievance without using their names. For example, "[i]dentifying someone by position has been held to fulfill the DC-ADM 804's identification requirement." *Travillion v. Wetzel*, 765 Fed. Appx. 785, 789 (3d Cir. Apr. 8, 2019) (citing *Johnson v. Johnson*, 385 F.3d 503, 523 (5th Cir. 2004) (noting "a grievance can sufficiently identify a person even if it does not provide an actual name; functional descriptions and the like—e.g., a reference to 'the guards in the shower room' on a certain date—would suffice)). *See also Diaz v. Palakovich*, 448 Fed. Appx. 211, 217 (3d Cir. Oct. 4, 2011) (determining that inmate's identification of "mailroom staff," along with grievance officer's subsequent interview of mailroom employees, obviated any procedural default that may have resulted from failure to specifically name mailroom employees). Courts have also held that a plaintiff's failure to identify individuals in his grievance is excused where the prison conducts an internal investigation and relies upon that investigation in its grievance response. *See Chaney v. Bednard*, 2020 WL 7864202, at *4–6 (W.D. Pa. Dec. 31, 2020); *Martin*

9

*v. Secretary of Corrections*, 2018 WL 1158250, at *4 (M.D. Pa. Mar. 5, 2018) (defendant knocked unconscious during assault excused from default for failure to identify defendants when they each filed reports afterwards identifying them as participants in the incident); *Schultz v. Doher*, 335 F.Supp.3d 177, 185 (D. Mass. 2018) (excusing plaintiff's default for failure to identify when officers involved in use of force incident wrote incident reports summarizing the incident).

In this case, In's grievance complained of the alleged inadequacy of the medical department's treatment of his skin condition. Stroup saw In on seven or eight occasions for assessment or treatment of that condition, which was documented in In's medical records. The Grievance Officer investigated this claim and should have noted Stroup's significant involvement from those records. In named Stroup specifically in his grievance appeal to the Facility Manager. *See* ECF No. 78-3, p. 8. Given these facts, prison officials were on notice of Stroup's involvement in the subject matter of the claim sufficient to satisfy the "identification" requirement of DC-ADM 804.

As further support for his exhaustion defense, Stroup points out that much of the conduct now at issue occurred after In had submitted his grievance and that In did not file a separate grievance concerning that conduct. In fact, In had fully appealed Grievance #767002 by December 17, 2018, before Stroup declined to perform the shave biopsy in January of 2019. Based on this timing, Stroup argues that In did not exhaust his claim against Stroup, at least to the extent it is based on conduct after he submitted Grievance #767002. He further argues that he was never provided the chance to cure his alleged mistake. *See* ECF No. 78, p. 9.

While Stroup is correct that the biopsy declination and other post-grievance events were not addressed in In's grievance, the Court finds that this is not fatal to his claim. The grievance

10

addressed what In has described essentially as an ongoing or continuing failure to provide proper medical care for his condition. *See* ECF No. 78-3, p. 8. In other contexts, courts have distinguished between claims of deliberate indifference to an ongoing medical condition, which In has asserted in this case, and claims based on discrete events. For example, when determining whether a grievance has been timely submitted, courts have found that the "continuing violation" doctrine applies to toll the submission deadline on a deliberate indifference to an ongoing medical condition claim but not as to a claim based on discrete events. *See Fulton v. Hakinberry*, 2015 WL 5098751, at \*4 (W.D. Pa. Aug. 31, 2015); *Corbin v. Bickell*, 2014 WL 3590000, at \*7 (M.D. Pa. July 21, 2014). *See also Ellis v. Vadlamudi*, 568 F.Supp.2d 778 (E.D. Mich. 2008) (holding that the continuing violation doctrine applied to a claim of deliberate indifference to a chronic medical condition); *McCormack v. Burnett*, 2013 WL 5408260, \*2 (W.D. Wisc. Sept. 25, 2013) (distinguishing ongoing inadequate medical care, which the continuing violation doctrine applies to, from a discrete medical issue, in which the doctrine does not apply). Applying the logic underlying these cases to the present case, In was not required to submit a new grievance concerning conduct that was part of the ongoing pattern of inadequate care he alleged in his pending grievance.

The Court also finds that ambiguity in the guidance provided by DC-ADM 804 also supports this result. Section 1(A)(14) of that policy states that "[a]ny grievance based on separate events must be presented separately, unless it is necessary to combine the issues to support the claim." Section 1(A)(15), however, states that "[a]ny grievance issue that has been or is currently being addressed will not be readdressed in a subsequent grievance." Where the inmate's concern relates to an alleged ongoing failure to provide adequate medical care, it is unclear whether the policy contemplates a single grievance or separate grievances addressing

separate care actions or omissions. Resolving this ambiguity in favor of In, the Court finds that he has administratively exhausted his claim as to all conduct that formed a part of the alleged ongoing deficiencies in his medical care, including conduct that occurred after the filing of the grievance. Accordingly, the Court will proceed to analyze whether the record is sufficient to support the substantive elements of In's Eighth Amendment claim.

### B. Eighth Amendment Claim

"Pursuant to the Eighth Amendment's prohibition on cruel and unusual punishment, prison officials are required to provide basic medical treatment to inmates." *Rouse v. Plantier,* 182 F.3d 192, 197 (3d Cir.1999). To establish an Eighth Amendment claim based on inadequate medical care, In must produce evidence to support two elements. First, he must make an objective showing that his medical need was serious. *See id.* Second, he must make a subjective showing that Stroup was deliberately indifferent to his serious medical need. *See id.* Stroup correctly argues that In has failed to produce evidence sufficient to sustain finding in his favor on either essential element.

The Court of Appeals for the Third Circuit has described a serious medical need as "one that has been diagnosed by a physician as requiring treatment or one that is so obvious that a lay person would easily recognize the necessity for a doctor's attention," *Monmouth County Corr. Inst. Inmates v. Lanzaro,* 834 F.2d 326, 347 (3d Cir. 1987), and one "such that a failure to treat can be expected to lead to substantial and unnecessary suffering, injury, or death." *Tsakonas v. Cicchi,* 308 Fed. Appx. 628, 632 (3d Cir. 2009). *See also Estelle v. Gamble,* 429 U.S. 97, 103 (1976) (a medical need is also serious where the denial of treatment would result in the "unnecessary and wanton infliction of pain," or a "life-long handicap or permanent loss."). In determining the seriousness of a medical condition, courts look to certain factors, including:

12

(1) "whether 'a reasonable doctor or patient would find [it] important and worthy of comment'"; (2) "whether the condition 'significantly affects an individual's daily activities'"; (3) "and whether it causes 'chronic and substantial pain.'" *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) (citations omitted).

In *McKeithan v. Beard*, the plaintiff brought an Eighth Amendment challenge based on the denial of proper treatment for his eczema skin condition. 2010 WL 2028091, at *2 (W.D. Pa. Apr. 12, 2010), *report and recommendation adopted*, 2010 WL 2028092 (W.D. Pa. May 21, 2010). The plaintiff asserted that he "experienced excessive itching and dry skin for years." *Id.* However, he provided no detail to substantiate more serious symptoms, such as bleeding. *See id.* In granting the defendants' motion for summary judgment, the court held that a finder of fact could not reasonably conclude that the plaintiff's eczema was a condition that "can be expected to lead to substantial and unnecessary suffering, injury, or death." *Id.* at *4.

The conditions and symptoms addressed by the court in *McKeithan* are analogous to those at issue in this case. In's deposition and his medical records confirm that he complained intermittently of inflammation and itching of the skin on his scrotum. In was diagnosed with Fordyce Spots or folliculitis. Both Fordyce Spots and folliculitis are conditions known to be benign and that do not require formalized testing or a treatment plan. Although In testified that his condition worsened with sweat, the associated discomfort was mitigated by showering and good hygiene. According to his deposition testimony, In's condition, while uncomfortable at times, did not materially disrupt his recreational and other activities. In never complained of any bleeding and never displayed evidence of infection. Given the symptoms of In's condition and the medical determinations by various medical professionals, including a specialist in dermatology, In's medical condition was not of such an objectively serious nature that it could

13

sustain an Eighth Amendment claim. *See Tsakonas*, 308 Fed. Appx. at 632 (affirming the dismissal of an Eighth Amendment claim premised upon a denial of treatment for "weight loss, eczema of the feet, seborrhea of the scalp, athlete's foot, constipation, and swollen knuckles on his right hand" on the basis that the prisoner had failed to allege a serious medical condition); *Simpson v. Prison Health Servs.*, 2010 WL 4318902, at *3 (W.D. Mich. Oct. 22, 2010) (holding that plaintiff's folliculitis and skin rashes did not constitute serious medical needs where, although uncomfortable, they did not materially inhibit his daily activities); *Sivak v. Murphy*, 995 F.2d 233 (9th Cir. 1993) (affirming summary judgment for defendants because "hemorrhoids, recurrent folliculitis and pilonidal cyst which [inmate] suffered" did not constitute serious medical needs). Although In also alleges that he suffered mental stress and psychological pain due the inadequate treatment he believes he received for his skin condition, these subjective reactions cannot overcome his lack of evidence to support the objectively serious nature of his condition.

Furthermore, even if In had adequately supported the "serious medical need" element of his claim, Stroup would still be entitled to summary judgment based on the insufficiency of the record to support the deliberate indifference element. To support a finding that Stroup was deliberately indifferent to his alleged serious medical need, In was required to produce evidence adequate to support a reasonable jury's finding that Stroup knew of and disregarded an excessive risk to inmate health or safety. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994). In other words, the evidence must support both that Stroup was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, and he also drew that inference. *See id.*

"[D]eliberate indifference is a subjective state of mind that can, like any other form of scienter, be proven through circumstantial evidence and witness testimony." *Pearson v. Prison Health Servs.*, 850 F.3d 528, 535 (3d Cir. 2017). Deliberate indifference has been found where a prison official "knows of a prisoner's need for medical treatment but intentionally refuses to provide it[,]" or "prevents a prisoner from receiving needed or recommended medical treatment." *Rouse*, 182 F.3d at 197 (citing *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993) (citing *Lanzaro*, 834 F.2d at 346-47)). Because a defendant's state of mind, like other facts, can be proved by circumstantial evidence, the *Farmer* standard does not require a defendant to admit his consciousness of the risk of serious harm before liability can be imposed. However, even gross errors of judgment are not constitutional violations; liability requires subjective, not objective, culpability. *See Farmer*, 511 U.S. at 843 n.8. A "plaintiff alleging deliberate indifference must show more than negligence or misdiagnosis of an ailment." *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001).

> The Court of Appeals for the Third Circuit has explained:
>
> It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute "deliberate indifference."
>
> \*\*\*
>
> "Deliberate indifference," therefore, requires "obduracy and wantonness," *Whitley v. Albers*, 475 U.S. 312, 319 (1986), which has been likened to conduct that includes recklessness or a conscious disregard of a serious risk. *See Farmer v. Brennan*, 511 U.S. 825, 842 (1994) (stating that "it is enough that the official acted or failed to act despite his knowledge of a substantial risk of serious harm").

*Rouse*, 182 F.3d at 197 (parallel citations omitted); *see, e.g., Spruill*, 372 F.3d at 235 ("Allegations of medical malpractice are not sufficient to establish a Constitutional violation."). Thus, "the mere receipt of inadequate medical care does not itself amount to deliberate indifference—the defendant must also act with the requisite state of mind when providing that inadequate care." *Pearson*, 850 F.3d at 535.

15

Moreover, when it comes to claims of deliberate indifference, there is a "critical distinction" between allegations of a delay or denial of a recognized need for medical care and allegations of inadequate medical treatment. *See id.* (citation omitted). Because "mere disagreement as to the proper medical treatment does not support a claim of an eighth amendment violation" when medical care is provided, we presume that the treatment of a prisoner is proper absent evidence that it violates professional standards of care. *Lanzaro*, 834 F.2d at 346; *see Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir. 1990) ("[I]t is well established that as long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights")).

That said, the fact that prison medical personnel have provided some medical care to an inmate does not preclude a finding of deliberate indifference:

> [T]here are circumstances in which some care is provided yet it is insufficient to satisfy constitutional requirements. For instance, prison officials may not, with deliberate indifference to the serious medical needs of the inmate, opt for "an easier and less efficacious treatment" of the inmate's condition. *West v. Keve*, 571 F.2d 158, 162 (3d Cir. 1978) (quoting *Williams v. Vincent*, 508 F.2d 541, 544 (2d Cir. 1974)). Nor may "prison authorities deny reasonable requests for medical treatment ... [when] such denial exposes the inmate 'to undue suffering or the threat of tangible residual injury.'" *Monmouth County Corr. Inst. Inmates*, 834 F.2d at 346 (quoting *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976)). And, "knowledge of the need for medical care [may not be accompanied by the] ... intentional refusal to provide that care." *Id.* (alterations in original) (quoting *Ancata v. Prison Health Servs.*, 769 F.2d 700, 204 (11th Cir. 1985)).

*Palakovic v. Wetzel*, 854 F.3d 209, 228 (3d Cir. 2017). Ultimately, the court "must examine the totality of an inmate's care when considering whether that care evidences deliberate indifference to his serious medical needs." *Gutierrez v. Peters*, 111 F.3d 1364, 1375 (7th Cir. 1997).

Here, it is undisputed that Stroup and other members of the medical department repeatedly met with and examined In regarding his skin condition and prescribed topical medications as treatment. They also arranged for his consultation with an outside dermatologist.

16

The record includes no evidence that Stroup's assessments and medical judgments deviated from standard or accepted medical practices. This includes Stoup's decision not to continue to pursue a shave biopsy when the medical providers at the prison declined to perform the procedure. Although one provider suggested a shave biopsy to further assess the condition, this appears to have been primarily to assuage In's concerns rather than a matter of medical necessity. After consulting with other medical personnel, Stroup determined that the procedure was not medically necessary and that its risks outweighed its benefits. *See* ECF No. 78, p. 11. The evidence in the record does not support an inference that any medical professional suspected In's condition to be anything other than benign or one that required treatment materially different from the treatment previously prescribed by Stroup and other medical personnel. Stroup's colleagues largely concurred with his diagnosis and treatment of In's medical condition.

All medical professionals assessed and documented In's skin condition as benign. These professionals included the dermatologist to whom In was referred. Records reflect that the outside dermatologist recommended a shave biopsy primarily to allay In's concern. *See* ECF No. 78-2, p. 34 ("Dermatology recommending shave biopsy for definitive diagnosis given patients [sic] concern."). He gave no indication that he suspected the condition to be anything more serious than Fordyce Spots. The preponderance of professional medical opinion in this case was that In's Fordyce Spots required only hygienic care by In himself and did not require further diagnostic procedures or treatment. The fact that In disagrees with this assessment and course of treatment does not give rise to an Eighth Amendment claim. It is a "well-established rule that mere disagreements over medical judgment do not state Eighth Amendment claims." *White v. Napoleon*, 897 F.2d 103, 110 (3d Cir. 1990) (citations omitted). "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment

violation." *James v. Pennsylvania Dep't of Corr.*, 230 Fed. Appx. 195, 197 (3d Cir. 2007). Even "a doctor's disagreement with the professional judgment of another doctor is not actionable under the Eighth Amendment." *Butler v. Zdziarski*, 2021 WL 743295, at *3 (M.D. Pa. Feb. 25, 2021). To the contrary, "prison medical authorities are given considerable latitude in the diagnosis and treatment of inmate patients." *Id.*

No genuine issue of material fact remains for trial concerning the care provided to In. The record is inadequate to support that Stroup acted with deliberate indifference to any serious medical condition of In. Accordingly, Stroup is entitled to judgment in his favor as a matter of law.

## V.   Conclusion

For the foregoing reasons, Defendant's Motion for Summary Judgment (ECF. No 77) will be GRANTED.

A separate Order follows this Memorandum.

Entered this 15th day of December 2021.

HON. RICHARD A. LANZILLO
United States Magistrate Judge